Armored Motor Service Corporation, Petitioner v. Pennsylvania Public Utility Commission, Respondent.

Submitted on briefs November 16, 1979, to Judges ROGERS, BLATT and MACPHAIL, sitting as a panel of three.

*William J. Lavelle,* of *Wick, Vuono & Lavelle,* for petitioner.

*Robert A. Christianson,* Assistant Counsel, with him *Alfred N. Lowenstein,* Deputy Chief Counsel, and *George M. Kashi,* Chief Counsel, for respondent.

*James W. Patterson,* with him, of counsel, *Harper, George, Buchanan & Driver,* for Purolator Security, Inc. and Purolator Courier Corp., intervening respondents.

*Herbert R. Nurick*, of *McNees, Wallace and Nurick*, for Brink's Incorporated, intervening respondent.

OPINION BY JUDGE BLATT, March 6, 1980:

The Armored Motor Service Corporation (Armored) appeals here from an order of the Pennsylvania Public Utility Commission (Commission) which denied its application in 1975 for a permit to operate as a motor common carrier. The application was denied because Armored failed to show the necessity of its proposed service as required by Section 1103 of the Public Utility Code, 66 Pa. C.S. §1103.[1] This denial, according to the opinion accompanying the Commission's order, was required largely because of the Commission's refusal to consider proffered evidence as to the need for and the adequacy of service provided by Armored for many years prior to its 1975 application. The evidence was refused because this prior service had not been authorized by the Commission.

Armored argues here that its apparently illegal service prior to 1975 was conducted under the color of right of a letter it had received in 1950 from the Commission's law bureau, sent in response to a request made at that time by Armored for the necessary forms to obtain a permit to operate as an armored car service. In that letter the Commission's counsel had stated that the Commission had no jurisdiction to regulate armored car services, and Armored contends that it relied on this assurance in providing its service thereafter. The Commission counsel evidently

---

[1] 66 Pa. C.S. §1103 states that a certificate of public convenience shall be granted by the Commission "only if the commission shall find or determine that the granting of such certificate is necessary or proper for the service, accommodation, convenience, or safety of the public."

relied mistakenly on a 1935 Superior Court decision[2] which held that contract carriers such as Armored were not subject to the Commission's regulation. This decision, however, was implicitly overruled in 1937 with the enactment of Article VIII of the Public Utility Law, Act of May 28, 1937, P.L. 1053, which specifically extended the Commission's jurisdiction to contract carriers.[3]

Upon receipt of the 1950 letter from the Commission's counsel, Armored commenced armored car service in Philadelphia and Bucks Counties and in 1953 it added a courier service in that area. Between 1950 and 1976, it provided intrastate armored car and courier service for 46 banks, businesses and churches in southeastern Pennsylvania, and in the early 1970's it entered into a contract with the General Services Administration of the United States to transport coin between Philadelphia and Pittsburgh, and it then applied for a Commission permit to operate as a contract carrier along the specific General Services Administration route. This permit was granted in August of 1974.

It is well settled that an applicant for common carrier authority who has rendered unauthorized service in the past cannot sustain the burden of showing its fitness based on evidence of the fitness of its unauthorized service unless it can also show, by clear and convincing evidence, that the service in question was provided as the result of a bona fide misunderstanding by the applicant as to the service authorized by the Commission. *Manganell v. Pennsylvania Public Utility Commission*, 18 Pa. Commonwealth Ct. 373, 335 A.2d 890 (1975). In *Bunting Bristol Transfer*,

[2] *Brink's Express Co. v. Public Service Commission*, 117 Pa. Superior Ct. 268, 178 A. 346 (1935).

[3] These provisions are now embodied in Chapter 25 of the Public Utility Code, 66 Pa. C.S. Chapter 25.

*Inc. v. Pennsylvania Public Utility Commission,* 418
Pa. 286, 210 A.2d 281 (1965), our Supreme Court
stated:

> [E]vidence of illegal operations deliberately
> rendered on the part of an applicant for a cer-
> tificate from the Commission and related ship-
> per testimony is 'improper for consideration by
> the Commission' and 'must be excluded' . . . .
> In considering applications of the character
> herein presented the Commission must not only
> make a finding whether the violation of a car-
> rier's certificated rights was based upon a *bona
> fide* misunderstanding but such finding must
> be based upon clear and convincing evidence.

418 Pa. at 292-93, 210 A.2d at 284.

The outcome of this appeal, therefore, depends up-
on whether or not the Commission properly found that
Armored had not met its burden of showing that its
prior unauthorized service resulted from a good faith
misunderstanding of the law caused by the letter it
received from the Commission's counsel in 1950. Our
review of the record reveals several inconsistencies
in Armored's argument, and we agree with the Com-
mission that Armored failed to meet this burden.

First, if Armored had relied so heavily on the 1950
letter, it would hardly have applied at all in 1972 for
authorization to operate as a contract carrier. This
observation of the Commission is especially significant
in the light of the obsolete Superior Court case on
which the letter was based,[4] which held that contract
carriers were not subject to the Commission's regu-
lation. The fact that Armored applied for a permit
to operate as a contract carrier indicates Armored's
awareness that the holding in the case concerned had
been superseded by subsequent legislation.

---

[4] *Brink's Express Co.,* note 2, *supra.*

Second, a representative of Armored testified that its 1972 application was prompted by its decision to reroute its Philadelphia to Pittsburgh route so as to eliminate a stop in Trenton, New Jersey, and Armored believed that this change would remove the route from the scope of authorization of the Interstate Commerce Commission, which had previously certificated the route, and, therefore, it required intrastate authority from the Commission. If Armored did so believe, then it at least had a fundamental grasp of the extent of the Commission's jurisdiction, and its assertion that it did not know that its intrastate services were subject to regulation seems even more dubious.

Third, as the Commission observed, if Armored actually had relied on the 1950 letter for 22 years of prior service, it would hardly have applied for authorization in 1972 without mentioning the letter. Moreover, if the reliance had been bona fide, surely Armored would have then revealed the extent of its other operations in the state.

Finally, as the Commission observed, every applicant for carrier permits is required to disclose in its application whether or not it is already providing the services for which permission is requested. If, as Armored contends, it did not understand the difference between a contract carrier and a common carrier, then Armored would surely have stated in its 1972 contract carrier application that it was already offering services of the class being applied for.

We believe that, although the Commission's counsel was in error in the letter sent in 1950, and although Armored's initial reliance thereon may have been justified, Armored's mere presentation of the 1950 letter, coupled with its professed ignorance of public utility law, does not amount to a clear and convincing showing that its reliance on the letter was in good faith.

We conclude, therefore, that Armored's proffered evidence of its prior illegal service was properly disregarded and that the order of the Commission must be affirmed.

## ORDER

AND Now, this 6th day of March, 1980, the order of the Pennsylvania Public Utility Commission in the above-captioned matter is hereby affirmed.

President Judge BOWMAN did not participate in the decision in this case.

Judge DISALLE did not participate in the decision in this case.